United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this Honorable Court. Good morning and welcome to our session which is being conducted by telephone. We were all had other ideas so we want to thank you for being with us as we try to do this remotely. Judge Pryor and Judge Branch and I would like to welcome all of you those who are listening in on our live stream and obviously counsel who are here today. We don't have lights for you to be able to see but Ms. Tisa is going to give each of you a two-minute warning to let you know when you've got a couple of minutes left to go on your argument and then I'll keep time from then on and let you know when you've come to the close of your time. But we'll be careful to try to not cut you off given the difficulty of communicating over the phone. And with that we're ready to begin. Our first case is number 19-14650. United States versus Julián Garzón. Mr. Dion. Good morning, Honors. Scott Dion on behalf of the United States. May it please the Court. This case presents a single statutory interpretation issue which both parties, both the government and Garzón, in fact agree can be resolved by looking at the statute's appeal is how we go about conducting this plain language analysis. What do the words of 3553F mean in practice? And more specifically, what do the words of 3553F1 mean in practice? Garzón believes this analysis of the text to be a simple and hyperliteral endeavor which requires stripping the provision down to justice words and reading those words with blinders on. In other words, ignorant to realities. But under this literalist reading, the provision loses its meaning and force. Imagine a defendant who served 25 years in prison for murder. He gets out 15 years ago and only a few months later commits an armed robbery, leading to a 10-year sentence. Upon release, he offends again, this time a drug offense which lands him in prison for four years. The guidelines say each of these offenses is a, quote, prior three-point offense. He has nine total points for violent and drug-related crimes. Undeniably, he's got a violent history. But because he doesn't have a prior two-point violent offense, meaning he was never sentenced to a term of less than one year and one month and greater than 60 days, he would be eligible for the safety valve under the defendant's reading. This statute was designed to allow nonviolent, low-level offenders relief from mandatory minimum sentences, not those defendants like these. This is why this court and the Supreme Court have long held that context matters, that interpreting a statute's plain text is actually a holistic endeavor, one which requires reading a statute in view of context, both within and without the provision at issue. Mr. Dionne, your position, I take it, is essentially that the word and, which connects subsections A, B, and C in 3553F1 should really be construed to be or. Is that right? That's right, to the extent that you read 3553F1 as an uninterrupted sentence. In other words, if you take away its structure and punctuation and read it, you know, just as a sentence, then yes, the word and, within that provision, should read as the word or. Okay. As we explain, I'm sorry. No, no, go ahead, finish up. Yeah, but as we explained in our briefs, the context clues, including the structure and punctuation, effectively allow you to read it as the defendant does not have A, more than four criminal history points, does not have B, a prior three-point offense, and does not have C, a prior two-point violent offense. So when we actually look at the context clues here, that's how the provision should be read. But if we were to read it just as an uninterrupted sentence, stripping it away, stripping away the structure and punctuation of it, then yes, the word or would be more appropriate there. But does it... Mr. Dionne, this is... No, no, go ahead, go ahead, please. Mr. Dionne, I was going to ask you, so it sounds to me like your interpretation is based entirely on the presence of the M- after the defendant does not have, and then the A, B, and C. Do you have any case that would give us any indication of the difference that that M- and that structure makes? I see that you look to the Sixth Circuit's decision in Mitchell v. Chapman, but in that case, the sentence did not include the word not. Is that right? Right. Admittedly, the case law on this is scant. There's not a case out there that says that the M- in a structure like this should operate in the way that we're saying. But the reality is when you look to Section 2, 3, and 4, it becomes clearer and clearer. And so, for example, in Section 4, the safety valve says that if the defendant was not an organizer, leader, manager, or supervisor, and was not engaged in a continuing criminal enterprise, then he may qualify. So these context clues, like the way that 4, 3, and 2 are set up, really require us to read the sentence in this way, require the M- to be read as a distributive operator. Our circuit frequently looks to Galea and Garner's treatise on reading law. And in that treatise, they describe a negative proof, meaning there's a not, is in the conjunctive form with an and, then basically the sentence says to be eligible, you must prove that you have not a, b, and c, and that that means the defendant must prove that he did not do all three. If we read the statute as a conjunctive negative proof, doesn't that support Mr. Garçon's if you read, what I believe the conjunctive negative proof construction means is that if it's set up in this way, where the lead into the sentence is does not have, and then there are three elements connected by an and, it's supposed to be read as the defendant has to affirmatively prove that he does not have all three, meaning he does not have a, does not have b, and does not have c. Under Garçon's reading, he's saying if he proves that he does not have just c or just a, then he will qualify for safety valve release. Now, Mr. Dion, the other provisions, the other requirements for achieving safety valve status in section 3553F, those are all set off by an and at the end, and one of the district courts that has ruled contrary to your position says that we need to interpret those two ands in the same way. You can interpret the and at the end of the list of subsection F one way, and then the and that links a, b, and c under subsection one a different way. What is your response to that? My response to that is the cases that they cite say that we put, and for example, Davis, the Supreme Court case says we presume the term is being used consistently, but this is a context here, clearly supports the government's reading that the end effectively means or within section one. Moreover, if the end is supposed to be read as a conjunction, meaning it connects all five elements, the government, again, believes that the does not have language should be within section one, the three will be connected, does not have a, does not have b, and does not have c, which is consistent with or logically equivalent to a disjunctive reading, does not have a, b, or c. Why isn't the statute at best ambiguous given that there, at least to me, there seem to be two reasonable ways of construing this text? You can construe it literally as you said, or you can construe it in the way that you suggest with a little bit of policy backdrop in the mind to suggest that Congress would not have created a statute that reads the way that Mr. Garzon advocates. So why isn't the statute ambiguous leading to a possible application of the rule of lenity? Well, the rule of lenity first is really used to address a grievous ambiguity, meaning after we've exhausted the applicable context, clues, and canons of interpretation, meaningful doubt still remains. But as our brief explained, when we look to these other areas such as the legislative history, the sentencing commission's guidance, the absurd results, all of these things really clear it up for us. So to the extent that there might be some ambiguity, meaning there could be two plausible constructions of this statute, this is easily solved by looking at, again, the legislative history, the sentencing commission's guidance, et cetera. Council, two minutes. Mr. Dionne, this is Lisa Branch. Just to be clear, I did not take it that you were arguing that this statute was ambiguous. I took it that you were arguing that once you start applying the canons of interpretation, you're going under the plain meaning of the statute. Am I incorrect? No, you're correct. Our position is that under the plain meaning analysis, using these context clues, there's only one correct and appropriate reading of the statute. It's that which effectively renders it disjunctive. So that would also, your position that this is the plain meaning of the statute would also rewrite the statute, correct? Correct. Again, this is at worst sloppy drafting, but we read the plain language of the statute using context clues, using our knowledge of the purpose of the statute, looking at its structure to read effectively as a disjunctive provision. Do you think it's appropriate, given that we live in a world of generally textualism, to be looking at legislative purpose to figure out which canons of construction to use? Well, I think even the most extreme view of textualism differs from literalism. And our point is that we can't just read a statute's words literally without looking at least elsewhere, even within the provision. But this court has been clear that the purpose of statutory interpretation is to give effect to the legislature's intent. And among other things, there's context clues and other things that really show us that, of course, it should be read effectively, disjunctively. So, no, I don't think it's inappropriate to look to the legislative purpose to inform our reading, because even the ultimate textualist will agree that textualism is not literalism. And with that, my time is up. All right, Mr. Dionne, you've saved your time for rebuttal. Thank you very much. Good morning, Your Honor. Yes, good morning, Your Honor. This is Gail Stage, and I represent Mr. Garcon. May it please the court. We have several points to make in regards to the government's argument, but I'd like to start with some real-world examples about how reading this statute in the conjunctive makes perfect sense. And one of those examples is, let's say you have a client with a lone three-point violent offense. That client does not have four points, and it must have an additional conviction in order to get to four points. But let's say also that it doesn't include the two points because, for example, they only served probation. And I'm not making these examples up. What I'm referring to is the United States Sentencing Commission's Office of Education and Sentencing Practice Manual. And in that manual, it has several real-world examples of how a defendant can even have eight criminal history points but still be eligible for the safety valve. And in fact, you can have a defendant as a career offender as long as the defendant's prior record doesn't include a three-point conviction or a two-point conviction. So I would refer that to the court. We did not cite to it in our brief, and I would be happy to submit it as supplemental authority if the court would like. I want to turn also now to the Scalia-Gardner argument. It was raised by the court. We have to do a little bit of a deeper dive into Scalia and Gardner's treatise. They say that some things that are listed individually are permitted but cumulatively are prohibited. And a fine example that they give is drunk driving. You're not allowed to drink and drive. That doesn't mean that you're not allowed to drink or drive because each, you know, you can either drive or you can drink, but you can't do it together. And in this case, if you look to the structure of the entire statute, which I believe that the government would like this court to ignore, and that is that the term and, as one of you all pointed out, includes one, two, three, four, and five. The government wants to acknowledge that that has to be so, but then at the same time, the government would like to say that as amended, F1 cannot possibly mean and. And there are several other real world examples. For instance, you can have a person, according to the samples from the sentencing guidelines, who was convicted of robbery, which we all would agree is, can be a violent offense. But if they only got eight years probation, then they don't have a two-point violent offense. And so therefore, that particular robbery would not count. Well, Ms. Stage, if we look at legislative purpose, it's hard to think of why Congress would have put these three conditions together, as opposed to coming up with three other conditions that might work a little bit better. To me, it's hard to think of these working in tandem. That doesn't mean that I don't agree with your statutory argument, but if you're looking at legislative purpose, it doesn't seem like these three were meant to operate together. Your Honor, only a small number of people with multiple serious violent offenses will be disqualified under F1. But the more high-level organizers, leaders, those who use violence or weapons, or those who participate as organizers and leaders, and maybe aren't truthful with the government, they're all still embraced within the safety valve. And if you look again at the structure of the safety valve, you'll see that the word or is in subsection three. It's in subsection two, two and three and four, actually, leader or an organizer. And we can't lose mind again of the fact that there is a drafting manual that's in place for, it's called the U.S. Senate Legislative Drafting Manual. It was actually published in 1997. And that drafting manual specifically on page 64 that the use of or between next two and the last criteria should be used. It should indicate an inclusion or more of a criteria. And the use of and indicates that it should be included only if it meets all the criteria. And again, that is the Senate Office Legislative Council Drafting Manual, which this is not a statute that was just born out of some sort of we saw that with Kraft, we saw that with a few other laws, that in retrospect, we might say, well, we were a little bit hasty passing those laws. And we've had to adjust them and change them. We haven't actually, Congress has. But in this case, you have a law that has been debated and discussed and picked apart since the Obama administration. So this is not a willy nilly writing of a law. So you have to believe that number one, the drafters were well aware of the use of and or, we know that because it's used interchangeably within the same statute. And also you've got the drafting manual and you have several years of debate over this particular provision. Interestingly, in the government... Ms. Page, this is Lisa Branch. But you would agree that the presumption that and is used conjunctively is not an absolute presumption. It can be rebutted, correct? Well, Fisk, for an example, is a case in which they said, if we don't interchange and or, then a statute is completely meaningless. It's completely, let's say, absurd. But again, if we go back to Scalia and Gardner, they talk about absurdity, and they say it should be limited in two ways. It should be limited in situations where the disposition, there's no reasonable person could possibly have intended this disposition. And inserting, supplying particular phrases, including or admitting particular phrases, then a statute can be considered absurd when there's obviously a technical or an administrative error. We don't have that here. We have a situation... Ms. Page, following up on the point that you're making now, it's sort of dovetailing with the point that Judge Jordan just made. If we were to construe and conjunctively here, wouldn't Section A be superfluous? Wouldn't it automatically meet the requirements of A if you meet B and C? No, Your Honor, it would not. And that is because while A may not carry its burden often, it does have a burden. And A is for the recidivists. B is for, let me jump to C for a minute. C is for violent offenders. And B is for severity, severity of a crime. Three points. We all know that if you get at least three points, you've done something wrong. In this case, this statute worked exactly the way Congress intended it to work. Judge Kahn, first of all, found that it was not ambiguous. So we don't even have to go to legislative history, whatever was said during the passage. If we look at the pure meaning of the law itself, we can see that in this particular situation, it worked exactly the way it was supposed to work. Mr. Garson had no qualifying Chapter 4 convictions other than a possession of a gun by a convicted felon. And that was three points. But his current crime, which was narcotics related, was not violent. He had a terrible childhood. We have to consider his history and characteristics. He saw his uncle's murder by a machete. He has post-traumatic stress disorder as a result of that. He was beaten with a broom by his father. He suffers from bipolar syndrome. And he has not committed a new crime in 13 years. Thirteen years. Judge Kahn used his discretion, and that is what this statute is meant to do. It is meant to give judges discretion. And it does that. It gave Judge Kahn discretion, and it's meant to give other judges discretion in how they want to sentence somebody. There's nothing to say that Judge Kahn couldn't have given Mr. Garson 60 months. It would have been an above-the-guideline sentence. It would have been a variance, yes. But after looking at all the circumstances of Mr. Garson's life, Judge Kahn used his discretion, which is the entire purpose of the revision of this statute, to give Mr. Garson what he considered, Judge Kahn considered, a fair sentence. So in looking at... Ms. Page, this is Jill Pryor. I want to take you back to the language of the statute because I think that's really what we need to be looking at here. I agree with you that the government misreads Scalia and Garner with respect to the conjunctive negative proof. But Scalia and Garner also say that we cannot ignore punctuation. And so what do you say about the MDASH and the structure of the ABC in F-1? In regards to the MDASH, Your Honor, the MDASH is, first of all, present in more than just one place in this statute. The MDASH is also located in what I'll call the introduction to subsection F. And in that, after the MDASH, the government concedes that we have to look at one and two and three and four and five. And I'm sure the government would not concede that somehow the word or can be inserted in there. A judge has to find all five. So we have MDASHs, we have semicolons throughout this entire statute. And again... I'm sorry. Okay. I'm sorry. I thought someone was trying to ask a question. Again, if we look to the drafters, we look to the history of this particular statute, and I'm not talking about the legislative history. We don't have to go there because it is unambiguous as found by Judge Kahn. What we have to look at is the overall purpose. And I hate that because it can be construed and misconstrued as legislative history. But we know that what was offenders and the most, let's say, recidivists among our defendants. And again, all of those people are still grouped in the safety valve and are ineligible for safety valve because of the other provisions of the safety valve. But there are real world examples in which subsection A, F1, excuse me, subsection F1 can be applied and get the kind of result that happened in this case and that Congress intended. So I don't believe that a literal reading of the statute results in anything but accomplishing the pursuits of Congress. And again, we have to presume that Congress knew what it was doing. There's a drafting manual. They have Scalia and Garner treatises as well, I'm sure. So this is a situation where the government doesn't like the result. And I think that we can identify that premise when we look at the government's brief. And in the brief, the government says, well, it would be best, and I put that word in quotes, to read it the way we want to read it. But that's not how we interpret statutes. It comes out one side or the other. We don't let judges rewrite statutes because they're inartfully drawn. What we have to do is interpret them literally. And if it's a result that Congress did not intend, we presume that Congress knows what's happening in the court and they'll fix it. And so that is where we are today. We believe that Judge Kahn was correct, that his interpretation was correct, and that this court should uphold his ruling. If there are no more questions, I will concede to the government's time. All right. Thank you very much, Ms. Page. Thank you. Am I good to go? Yes, you're all set, Mr. Dionne, whenever you're ready. Okay. Sorry about that. Mr. Dionne, let me just jump in really quickly. Do you agree that you have done misconstrued the Scalia-Garner negative proof canon? No, I don't. And... Can you walk us through how you have not misconstrued it? Sure. And it was cited in our initial brief. And the way that I read it was, a conjunctive negative proof fundamentally appears as follows. To be eligible, you must prove that you have not A, B, and C. This is used in legislative drafting to require that the defendant prove he does not meet each of the listed conditions. He does not have A, he does not have B, and he does not have C. That's the way that we read the Scalia-Garner conjunctive negative proof. And I maintain that that supports the government's argument. Mr. Dionne, I think you've correctly read that canon from Scalia and Garner. But the Supreme Court has also told us that it's not enough that hard and objectionable or absurd consequences are the result of a literal interpretation. And that if that's the that's from Griffin versus Oceanic Contractors, a 1982 Supreme Court case, why isn't this a case for the use of that cautionary principle? Congress may have intended something else, but they wrote something very, very different. We should interpret what Congress wrote, not what it intended, and let Congress fix it. If that turns out to be not what was meant. Right. Well, first, I'll say that our interpretation of the plain language is that Congress actually meant the word end here and meant that the does not have language was distributed throughout Section 1 to read that the defendant does not have A, does not have B, and does not have C. As to the absurd results, I wanted the impression as black letter law, at least in this circuit, that a statute should be read if at all possible so as to avoid unjust or absurd conclusions. And the defendant has conceded as much of this is an absurd conclusion in his brief. And I think the absurd here are pretty clear. Now, as to, I just wanted to address, and I only have limited time here, I wanted to address one thing that the defense raised in their argument, and it's that the Section A is not superfluous. I'm not sure under what she, defense did not provide any example that would render this not superfluous if the defendant had a prior three-point offense and a prior two-point violent offense. Those things are mutually exclusive, and if you have those two, you automatically have more than four criminal history points. That's our argument as to the superfluity. And just one last point, I'm running out of time here. As to defense's argument that the purpose of A, B, and C, the purpose of A is recidivism, purpose of B is severity, and the purpose of C is violent offenses, we would agree with that. Congress intended this to cover only those nonviolent low-level offenders, but to require that a defendant have all three of those is to take that purpose completely away from the statute. Requiring a defendant to be a recidivist and a severe offender and a violent offender completely misinterprets Congress's intent here, leads to absurd results, and is simply wrong as a matter of law. Thank you for your time this morning. Thank you very much. Thank you, Ms. Stage. Thank you, Mr. Dionne. We really appreciate the help. Thank you.